UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
R4 GL ACQUISITION LLC,
a Delaware limited liability company,

Plaintiff and Counterclaim Defendant,

- against -

GLORIETA LLC, a Florida limited liability company, and NEW VISION GLORIETA, LLC, a Florida limited liability company,

Defendants and Counterclaim Plaintiffs,

- and -

GLOBE-OP DEVELOPMENT, LLC, a Florida limited liability company, CREATIVE CHOICE HOMES, INC., a Florida corporation, NAIMISHA CONSTRUCTION, INC., a Florida corporation, DILIP BAROT, an individual, and NAIMISHA BAROT, an individual,

Defendants,

- against -

CHRIS SULLIVAN, an individual, MARC SCHNITZER, an individual, and GLORIETA PARTNERS, LTD., a Florida limited partnership,

Third-Party Defendants.

-----------------------------------------X

**MEMORANDUM AND ORDER**

25 Civ. 944 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff R4 GL Acquisition, LLC ("R4") brings this action against Glorieta LLC, New Vision Glorieta, LLC, Creative Choice Homes, Inc., Naimisha Construction, Inc., Globe-Op Development,

LLC, Dilip Barot, and Naimisha Barot, asserting claims arising from the development, rehabilitation, and operation of Glorieta Gardens, an affordable housing complex in Opa-locka, Florida. In response, Glorieta LLC and New Vision Glorieta, LLC (together, "Glorieta," the "General Partners," or "counter-plaintiffs") assert counterclaims against R4 and third-party claims against Chris Sullivan, Marc Schnitzer, and Glorieta Partners, Ltd., alleging that R4 agreed to assume responsibility for certain repair work and for obtaining specific forms to secure tax credits, but later abandoned those obligations and removed Glorieta as general partners. Specifically, Glorieta asserts claims for: (i) breach of contract; (ii) breach of verbal agreement; (iii) promissory estoppel; (iv) breach of the covenant of good faith and fair dealing; (v) fraudulent misrepresentation; (vi) breach of fiduciary duty; (vii) aiding and abetting breach of fiduciary duty; (viii) indemnification; (ix) an equitable accounting; and (x) unjust enrichment.

Presently before the Court is the motion of R4, Mr. Sullivan, and Mr. Schnitzer (together, "counter-defendants") to dismiss Counts I through VII, Count IX insofar as asserted against R4, and Count X pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.[1] For the reasons set forth below, counter-defendants' motion is granted.

## I. Factual Background[2]

### a. The Partnership and Glorieta Gardens

The facts of this case have been partially set out in a prior opinion issued by this Court. See R4 GL Acquisition LLC v. Glorieta LLC, 2026 WL 579181 (S.D.N.Y. Mar. 2, 2026). Presuming the parties' familiarity with the relevant facts, we recite only those necessary to address the instant motion. In September 2015, R4, Glorieta LLC, and New Vision Glorieta, LLC entered into a Second Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement" or "Agreement") governing Glorieta Partners, Ltd. (the "Partnership"). AC ¶ 3; SAC ¶ 8. The Partnership was formed to acquire, rehabilitate, develop, maintain, and operate Glorieta Gardens, a 330-unit affordable

[1] Glorieta Partners, Ltd. does not join the present motion because it had not been served with the Second Amended Counterclaim and Third-Party Claims when the motion was filed. ECF No. 115 at 1 n.2. Accordingly, the Court addresses Count IX only insofar as it is asserted against R4 and does not address Count VIII, which is asserted solely against Glorieta Partners, Ltd.

[2] Unless otherwise noted, the following facts are drawn from the Second Amended Counterclaim and Third-Party Claims (the "SAC"), ECF No. 104, and the documents incorporated therein or integral thereto. For purposes of the present motion, the Court accepts the SAC's well-pleaded factual allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court also refers to plaintiff R4's Amended Complaint ("AC"), ECF No. 61, and attached exhibits for undisputed background and, where expressly noted, to describe R4's competing allegations concerning the events at issue.

housing property in Opa-locka, Florida (the "Property"). AC ¶¶ 39-41; SAC ¶ 9. Glorieta LLC and New Vision Glorieta, LLC served as the Partnership's General Partners, while R4 served as the Investor Limited Partner. AC ¶¶ 3-4; SAC ¶¶ 8, 11. The Partnership Agreement contemplated that R4 would contribute up to $15,229,000 in capital to the Partnership. AC ¶ 48. After an initial contribution, the remaining capital was to be paid in four installments upon the achievement of certain development, occupancy, financial-stabilization, and tax-credit conditions. AC ¶ 48; ECF No. 61-1 ("P'Ship Agreement") § 3.3.1. In exchange for its investment, R4 was entitled to receive 99.99% of the low-income housing tax credits generated by the Property. AC ¶ 49. The Property's rental income was subsidized primarily through a Section 8 Housing and Assistance Payment Contract between the Partnership and U.S. Department of Housing and Urban Development ("HUD") (the "HAP Contract"). SAC ¶ 10; AC ¶ 53. The parties anticipated that the HAP Contract would provide most of the Property's rental income and enable the Partnership to satisfy its operating expenses and debt-service obligations. AC ¶¶ 53, 78.

The Partnership allocated different responsibilities to Glorieta and R4. Glorieta possessed "exclusive management and control of the business of the Partnership," P'Ship Agreement §

4.1, and was responsible for "supervising in all respects the management of the Project," id. § 4.6.1. Consistent with those provisions, Glorieta was responsible for maintaining the Property and making necessary repairs to keep it in working order. SAC ¶ 11. The Partnership Agreement granted R4 certain review, consent, and approval rights. Specifically, Glorieta was required to submit materials concerning the issuance of Internal Revenue Service Forms 8609 to R4 for review, P'Ship Agreement § 11.3.6, and to obtain R4's approval for construction change orders exceeding $25,000, id. § 14.16.1. The Agreement also required Glorieta to keep R4 informed of material developments concerning the Property, including defaults under the HAP Contract, notices of violation from HUD, and material litigation. Id. § 11.3.12.

Forms 8609, issued by the Florida Housing Finance Corporation, were necessary for the Partnership to obtain and allocate the contemplated housing tax credits. SAC ¶¶ 13-14. Their issuance depended upon the Property's compliance with applicable development and maintenance requirements. Id. ¶ 14. The Partnership Agreement required Glorieta to prepare the necessary certifications and undertake the reporting actions required for the Partnership to qualify for the tax credits. P'Ship Agreement § 14.32. The Agreement further provided that it

could not be amended or modified by Glorieta without the "Consent of the Investor Limited Partner." Id. § 12.1. "Consent of the Investor Limited Partner" was defined as R4's "prior written consent or written approval." Id. at 10. Finally, Section 6.2 authorized R4 to remove a General Partner for "Cause," as defined in the Agreement. Id. § 6.2.

**b. Conditions at the Property and Allegations Concerning R4's Responsibilities**

The parties agree that significant maintenance and repair issues arose at the Property. According to the SAC, by 2022, those issues included problems with sanitary lines and water intrusion. SAC ¶ 15. R4 alleges broader problems including deficient rehabilitation work, inspection failures, mold, sewage, and other health and safety concerns. AC ¶¶ 63-76. Glorieta alleges that, in response to the issues arising in 2022, the parties agreed to alter their respective responsibilities under the Partnership Agreement. Specifically, Glorieta alleges that the parties agreed jointly to "fund, manage, and direct" repair work at the Property, with responsibility for some work falling exclusively to R4. SAC ¶ 16. Glorieta further alleges that R4 agreed to hire, fund, and direct the law firm Stearns Weaver Miller in pursuing the issuance of the Forms 8609. Id. ¶ 17. According to Glorieta, these agreements and the parties' subsequent course of conduct modified

the provisions of the Partnership Agreement addressing the parties' respective funding, management, and repair responsibilities. Id. ¶ 24.

The SAC identifies four sets of communications as evidence of R4's assumption of these responsibilities. First, on May 23, 2022, Chris Sullivan, an R4 executive, emailed Jeff Staley of New Vision Glorieta, LLC and others concerning drainage, sanitary, and moisture-prevention work at the Property. Id. ¶ 19. Mr. Sullivan wrote that R4 needed to be "in the loop" concerning the identity of the contractors, the scope and cost of the work, and its timing. Id. He further stated that "New Vision, Creative Choice and R4 as limited partner are the decision makers," that he should be copied on all correspondence, and that R4 would not accept a scope of work that failed to address known physical problems. Id.

Second, in a June 30, 2023 email to a city official, Mr. Sullivan stated he inspected the units at one portion of the Property and "assisted with developing the scope of the work." Id. ¶ 20. Third, on January 25, 2024, Mr. Sullivan advised HUD that he visited the Property and that ownership, "in partnership with R4, as Limited Partner," was taking measures to improve conditions. Id. ¶ 21. Fourth, in January 2024, a plumbing vendor communicated with Mr. Sullivan concerning repairs to the sanitary-

drain system, after which Mr. Sullivan informed Mr. Staley of the agreement concerning the repairs. Id. ¶ 22. Glorieta alleges that, consistent with these communications, R4 funded, managed, and directed certain repair work and retained and directed Stearns Weaver Miller in connection with the Forms 8609. Id. ¶¶ 18, 23. R4 disputes that these actions reflected any modification of the Partnership Agreement and maintains that its conduct was consistent with the review, approval, and oversight rights it possessed as Investor Limited Partner. AC ¶¶ 66-67.

R4's Amended Complaint attaches a Fourth Installment Payment Date Certificate executed by Glorieta on November 9, 2022. ECF No. 61-11. R4 alleges the certificate acknowledged that the contractual requirements for "Rental Achievement" had not been satisfied and stated that Glorieta continued to use commercially reasonable efforts to obtain Forms 8609. AC ¶¶ 100-05. R4 also alleges it made an additional payment notwithstanding the failure to achieve Rental Achievement. Id. ¶¶ 100, 103. Glorieta, on the other hand, alleges that R4 has not paid the entire amount required under Section 3.3 of the Agreement and that $4,593,928 remains outstanding. SAC ¶¶ 29, 39.

**c. HUD's Abatement of the HAP Contract and Removal of the General Partners**

Conditions at the Property continued to deteriorate during 2023 and 2024. On March 25, 2024, HUD issued the Partnership a notice of default stating that exigent health and safety deficiencies identified during a March 11 inspection had not been corrected and that failure to cure could result in the suspension of payments under the HAP Contract. ECF No. 61-7. On April 4, 2024, HUD issued a notice abating the Property's Section 8 housing-assistance payments. ECF No. 61-8. Glorieta acknowledges that HUD had become dissatisfied with the progress of the repair work and indicated its intention to abate the payments made under the HAP Contract. SAC ¶ 25.

The parties offer differing accounts of responsibility for these events. R4 alleges that Glorieta failed to address the health and safety problems, failed to notify R4 of the HUD default notice -- thereby causing the abatement of the HAP Contract -- and that these events constituted Cause under Section 6.2 of the Agreement and justified the removal of the General Partners. See generally AC ¶¶ 109-13. Glorieta alleges that when HUD became dissatisfied, R4 abandoned the responsibilities it previously agreed to undertake. According to Glorieta, R4 stopped funding repair work, ceased directing Stearns Weaver Miller in connection

with the Forms 8609, and notified Glorieta that it had been removed from the Partnership. SAC ¶ 26. The General Partners allege that their removal was wrongful and undertaken for R4's financial benefit rather than for Cause under the Partnership Agreement. Id. ¶¶ 27-28, 31, 42, 57. Glorieta further alleges that absent their removal, they would have received the majority of the Property's equity following the expiration of the applicable fifteen-year compliance period. Id. ¶ 27. According to the SAC, R4 received $23,361,774 in tax credits and $11,575,680 in losses generated by the Property and now stands to obtain the Property's equity following the removal of the General Partners. Id. ¶¶ 28-29. Glorieta alleges that R4 obtained these benefits while failing to pay the $4,593,928 due under the Partnership Agreement. Id. ¶ 29.

## II. Procedural Background[3]

Plaintiff filed its Amended Complaint on August 1, 2025, asserting claims against the General Partners, other corporate entities involved in the development and operation of the Property, and Dilip and Naimisha Barot. ECF No. 61. In sum, R4 alleges that defendants breached the Partnership Agreement and related

[3] The following procedural history relates only to the instant motion and does not concern Mr. and Mrs. Barot's partial motion to dismiss, which the Court denied on March 2, 2026. ECF No. 132.

agreements, mismanaged the Property, engaged in self-dealing, and caused R4 to incur substantial losses and additional expenses. See generally ECF No. 61. On August 14, 2025, defendants answered the Amended Complaint, and Glorieta LLC and New Vision Glorieta, LLC asserted counterclaims and third-party claims against R4 and third-party defendants Chris Sullivan and Marc Schnizter. ECF No. 68. On September 9, 2025, R4 and Messrs. Sullivan and Schnitzer filed pre-motion letters proposing a motion to dismiss the counterclaims and third-party claims. ECF Nos. 81, 82. The counter-plaintiffs opposed the requests on September 15, 2025. ECF No. 85. On September 19, 2025, the Court permitted R4 and Messrs. Sullivan and Schnitzer to bring their motion without a pre-motion conference and granted counter-plaintiffs leave to amend by October 10, 2025, if, consistent with Rule 11, they could cure any alleged deficiencies raised by R4 and Messrs. Sullivan and Schnizter. ECF No. 87.

Counter-plaintiffs filed amended counterclaims and third-party claims on October 10, 2025, adding Glorieta Partners, Ltd. as an additional third-party defendant. ECF No. 88. On October 20, 2025, counter-plaintiffs filed a letter requesting leave to file second amended counterclaims for the purpose of including a May 23, 2022 email from Mr. Sullivan. ECF No. 92. R4 and Messrs.

Sullivan and Schnitzer opposed the request the next day. ECF No. 93. On October 23, 2025, the Court granted counter-plaintiffs leave to file second amended counterclaims for the specific purpose of adding the referenced email only. ECF No. 94. Counter-plaintiffs filed the Second Amended Counterclaim on November 5, 2025, asserting ten causes of action: (i) breach of contract against R4; (ii) breach of verbal agreement against R4; (iii) promissory estoppel against R4; (iv) breach of the covenant of good faith and fair dealing against R4; (v) fraudulent misrepresentation against R4 and Messrs. Sullivan and Schnitzer; (vi) breach of fiduciary duty against R4; (vii) aiding and abetting breach of fiduciary duty against Messrs. Sullivan and Schnitzer; (viii) indemnification against Glorieta Partners, Ltd.; (ix) accounting against R4 and Glorieta Partners, Ltd.; and (x) unjust enrichment against R4. ECF No. 104.[4]

On November 19, 2025, R4 and Messrs. Sullivan and Schnitzer moved to dismiss Counts I through VII and Counts IX and X of the Second Amended Counterclaim. ECF No. 115 ("Mot."). Counter-

[4] On November 6, 2025, R4 and Messrs. Sullivan and Schnitzer requested that the Court strike Count V of the Second Amended Counterclaim on the ground that the addition defied the Court's directive that counter-plaintiffs could amend their once-amended counterclaims to add the referenced email and for no wider purpose. ECF No. 108. Counter-plaintiffs objected to that request on November 10, 2025, ECF No. 109, and the Court denied the request from R4 and Messrs. Sullivan and Schnitzer on November 12, 2025. ECF No. 112.

plaintiffs filed their opposition on December 10, 2025, ECF No. 117 ("Opp."), along with a supporting declaration attaching three exhibits, ECF Nos. 117-1, 117-2, 117-3, 117-4. The motion was fully briefed on December 17, 2025. ECF No. 119 ("Reply").

## III. Legal Standard

### a. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court accepts the truth of the pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

## DISCUSSION

Counter-defendants move to dismiss the Second Amended Counterclaim pursuant to Rule 12(b)(6), arguing: (i) that Glorieta fails to plausibly allege any enforceable modification of the Partnership Agreement or breach of the Agreement as written; (ii) that the promissory estoppel, implied covenant, fraud, fiduciary duty, and aiding and abetting claims are inadequately pleaded or duplicative; and (iii) that the accounting and unjust enrichment claims are unavailable in light of the parties' express contract. See generally Mot. We address each argument in turn.

### I. Breach of the Partnership Agreement as Modified

#### a. The SAC Does Not Plausibly Allege a Modification of the Partnership Agreement

Several of Glorieta's counterclaims rest on the premise that, beginning in 2022, the parties modified the Partnership Agreement to reallocate certain responsibilities from Glorieta to R4. Specifically, Glorieta alleges that the parties agreed to "jointly fund, manage, and direct" repair work at the Property, with some unspecified work falling solely within R4's purview, and that R4 agreed to hire Stearns Weaver Miller in pursuing Forms 8609. SAC ¶¶ 16-17. Glorieta argues that the Partnership Agreement was modified through the parties' writings and their course of dealing. Id. ¶¶ 18-24. Counter-defendants respond that the writings upon

which Glorieta relies do not reflect any modification and that Glorieta has not otherwise pleaded an enforceable oral modification. Mot. at 6-13. The Court agrees with counter-defendants.

The Partnership Agreement is governed by Florida law. See Partnership Agreement § 16.8. Section 12.1 provides that the Agreement may not be "amended or modified by the General Partner without the Consent of the Investor Limited Partner." Id. § 12.1. The Agreement defines "Consent" as R4's "prior written consent or written approval." Id. at 10. Glorieta advances two theories for satisfying this requirement: first, that four email communications involving Mr. Sullivan evidence R4's written consent to the alleged modification; and second, that even absent written consent, the parties orally modified the Agreement and acted pursuant to that modification. Neither theory is persuasive.

**i. The Emails Do Not Reflect R4's Written Consent to Modification**

Under Florida law, emails between parties to an agreement may, under certain circumstances, constitute a writing sufficient to modify an agreement. See, e.g., HTC Leleu Fam. Tr. v. Piper Aircraft, Inc., 571 F. App'x 772, 776 (11th Cir. 2014). However, that proposition does not resolve the issue presently before this Court. The relevant inquiry is not whether an email can satisfy

a writing requirement in the abstract, but whether the communications alleged in the SAC objectively manifest R4's consent to the modified obligations that Glorieta seeks to enforce.

At the threshold, three of the four communications identified in the SAC are not directed to Glorieta at all. The June 2023 email from Mr. Sullivan was sent to a representative of First Housing, a third-party mortgagee that provides financial and compliance monitoring services, with Mr. Staley, a representative from New Vision Glorieta, LLC copied. SAC ¶ 20; ECF No. 117-3. Similarly, the January 2024 email from Mr. Sullivan was sent to a HUD official, with Mr. Staley again copied. SAC ¶ 21; ECF No. 117-4. As alleged, a fourth communication originated from a plumbing vendor, and Mr. Sullivan responded before notifying Mr. Staley of its contents. Id. ¶ 22. Only the May 23, 2022 communication was directed to a Glorieta representative as a primary recipient. SAC ¶ 19; ECF No. 117-2. The cases upon which Glorieta relies for the proposition that emails can modify a written agreement involved writings exchanged between contracting parties themselves and memorialized or negotiated the essential, specific terms at issue.[5] Communications directed to third

[5] See HTC Leleu Fam. Tr., 571 F. App'x at 776 (holding that correspondence between parties reflecting the revised agreement, coupled with complete performance under its terms, supported modification claim); McGuire v. Adex Corp., 2017 WL 1422426, at *3-*4 (M.D. Fla. Apr. 19, 2017) (acknowledging that

parties, such as financial services entity or federal regulator, do not fit that mold.

Even focusing on the single email addressed to a Glorieta representative, Glorieta's theory fails. Mr. Sullivan stated in the May 23, 2022 email that R4 needed to "be in the loop" concerning certain repair work, including the identity of the contractors, scope and cost, and timing. SAC ¶ 19; ECF No. 117-2. Mr. Sullivan continued that "New Vision, Creative Choice and **R4 as limited partner** are the decision makers," that he should be copied on correspondence, and that R4 would not accept a scope of work that failed to address the physical issues. SAC ¶ 19; ECF No. 117-2 (emphasis added). The email shows that R4 expected to be consulted and to exercise authority over the approval of the proposed work. It does not state that R4 agreed to fund or manage the work, much less that it assumed ultimate responsibility for obligations previously assigned to the General Partners. Indeed, the email expressly identifies R4 "as limited partner," a role that already

emails may constitute a written modification in certain circumstances, but concluding that the parties' exchange was unenforceable because it left material terms unresolved); BrewFab, LLC v. 3 Delta, Inc., 2022 WL 7214223, at *3-*4 (11th Cir. Oct. 13, 2022) (concluding that a party became bound by sending a counterparty a text memorializing the agreed-upon terms of a guaranty obligation); TW Cleaning Servs., Inc. v. Wawa, Inc., 2018 WL 6983493, at *3 (M.D. Fla. Nov. 27, 2018) (explaining that written modifications may take several forms "**provided the writings address the essential terms of the agreement.**") (emphasis added).

included the right to approve certain construction change orders and to receive information concerning the Property. See P'Ship Agreement §§ 11.3.12, 14.16.1.

The remaining communications appear further removed from an agreement to modify the parties' contractual obligations. In June 2023, Mr. Sullivan advised the City of Opa-locka that he inspected certain units at the Property and "assisted with developing the scope of the work." SAC ¶ 20; ECF No. 117-3. In January 2024, he informed HUD that he visited the Property and that "ownership, **in partnership with R4, as Limited Partner**," was taking proactive measures to improve conditions. SAC ¶ 21; ECF No. 117-4 (emphasis added). Like the May 2022 email, both statements affirmatively describe the role of R4 as Investor Limited Partner and cannot be characterized as an offer to assume a different role.

Further, none of the four communications refer to the Partnership Agreement, state that any provision of the Agreement is being amended, or identify a contractual obligation that R4 agreed to assume. The communications do not specify which repairs R4 was required to fund or manage, the amount or duration of any funding obligation, the scope of R4's management authority, or the responsibilities from which Glorieta was to be relieved. The cited correspondence also does not reference Stearns Weaver Miller or

the Forms 8609, and the SAC's bare allegation that R4 separately hired that firm, id. ¶ 23, does not convert unrelated emails into written consent to a modification. At most, the communications show that R4 was involved in monitoring and attempting to address issues at the Property. That participation in matters concerning R4's investment does not manifest consent to assume another party's responsibilities, particularly where the governing agreement already afforded R4 certain review and approval rights. Accordingly, the SAC does not plausibly allege that R4 provided the written consent required by Section 12.1.

**ii. The SAC Does Not Plead an Enforceable Oral Modification**

Glorieta next argues that the parties orally modified the Partnership Agreement and performed in accordance with that modification. SAC ¶¶ 34-36. Counter-defendants respond that the Agreement could be modified only with R4's written consent and that, in any event, the parties' course of conduct confirms that the Agreement, not any purported modification, governed their relationship. Mot. at 7-11. The Court agrees with counter-defendants.

Florida law generally requires enforcement of contractual provisions requiring written modifications, but an exception exists where an oral modification "has been accepted **and** acted

upon by the parties in such manner as would work a fraud on either party to refuse to enforce it." Prof'l Ins. Corp. v. Cahill, 90 So. 2d 916, 918 (Fla. 1956) (emphasis added). As Florida's Fourth District Court of Appeal explained in Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc., the requirements elucidated in Cahill are conjunctive, rather than disjunctive. 145 So. 3d 989, 995 (Fla. Dist. Ct. App. 2014). A party seeking to enforce an oral modification notwithstanding a no-oral-modification clause therefore must establish that: (i) the parties agreed upon and accepted the oral modification; (ii) the parties (or, at a minimum, the party seeking to enforce the amendment) performed consistent with the terms of the alleged oral modification; and (iii) due to plaintiff's performance under the contract as amended, defendant received and accepted a benefit that it otherwise was not entitled to under the original contract.[6] Id.

Here, the SAC does not adequately plead any of the three requirements. First, the allegation of mutual assent is conclusory and states only that, at some point in 2022, the parties "agreed"

---

[6] Glorieta argues that the Okeechobee Resorts standard is "more restrictive" than that applied by certain federal courts. Opp. at 10-11. The federal cases cited by Glorieta are of no moment. Okeechobee Resorts expressly interpreted Cahill, which remains the governing decision of the Florida Supreme Court, and Okeechobee Resorts merely explained the requirements for an alleged oral modification to have been "accepted and acted upon" in a way that would make nonenforcement fraudulent. 145 So. 3d at 994-95. Accordingly, the Court applies that standard.

to share responsibility for repair work and for obtaining Forms 8609. SAC ¶¶ 16-17. It does not identify who made the alleged agreement on behalf of either party, when or how the agreement was reached, or the scope of the obligations assumed by R4. Further, the SAC does not identify which work was to fall "solely under the purview" of R4, how long the obligations would continue, or what constituted satisfactory performance. While Glorieta is not required to prove the modification at this stage, it must allege facts sufficient to render the existence and terms of the modification plausible. A bare assertion that an agreement was reached does not do so.

Second, the SAC does not plausibly allege performance by Glorieta consistent with any modification and distinct from its obligations under the Agreement. Glorieta's allegations that R4 funded and managed certain repair work and hired Stearns Weaver Miller concern R4's conduct and do not concern performance by Glorieta in reliance upon the alleged modification. The SAC does not identify additional obligations Glorieta undertook, any obligation it ceased performing with R4's assent, or any other act explicable only by reference to the supposed modification. Instead, the specific conduct alleged (e.g., coordinating with R4 regarding repair work) is consistent with Glorieta's original

responsibility to manage and maintain the Property. Further, R4's alleged involvement in repairs is consistent with its rights as Investor Limited Partner.

Finally, the SAC does not allege that, through Glorieta's performance pursuant to any modification, R4 received a benefit to which it was not already entitled under the Agreement. Glorieta alleges only that R4 received tax credits and losses generated by the Property and may obtain additional equity following Glorieta's removal from the Partnership. Id. ¶¶ 27-29. However, those credits and losses were benefits expressly allocated to R4 in the Agreement. P'Ship Agreement §§ 7.1.1(ii), 7.1.4. In addition, any potential equity interest identified in the SAC is allegedly the result of Glorieta's removal, not from any performance rendered by Glorieta pursuant to the 2022 modification.[7]

**iii. The Alleged Modification Is Independently Barred by the Statute of Frauds**

The alleged 2022 modification also fails under Florida's Statute of Frauds. Florida law provides that "[n]o action shall

[7] In their opposition, Glorieta argues that R4 received independent consideration in the form of management powers that previously were vested exclusively with Glorieta. Opp. at 12-13. That theory is not alleged in the SAC, and a party may not amend its pleading by presenting new theories in briefs. Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998). Further, the SAC does not allege that R4 bargained for additional management authority in exchange for assuming new obligations or that Glorieta surrendered that authority.

be brought" upon an agreement "that is not to be performed within the space of 1 year from the making thereof," unless the agreement, or some note or memorandum thereof, is in writing and signed by the party to be charged. Fla. Stat. § 725.01. The statute applies to original agreements and alleged oral modifications that fall within its scope. Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc., 262 F. Supp. 2d 1334, 1360-62 (S.D. Fla. 1999) (citation omitted). Here, the Partnership Agreement governs the parties' relationship throughout a fifteen-year compliance period and imposes obligations concerning the development and maintenance of the Property and thus plainly falls within the Statute of Frauds. P'Ship Agreement § 4.3; SAC ¶ 27. Glorieta alleges that the parties modified the Agreement's existing allocation of management and operational responsibilities, and those obligations were not, by their terms, confined to a period of less than one year. SAC ¶¶ 16-17, 24, 32. The alleged modification therefore was required to be memorialized in a writing signed by R4. As discussed above, the emails identified in the SAC do not satisfy that requirement because (i) they do not state that R4 agreed to modify the Agreement or assume different responsibilities, (ii) they do not identify the obligations transferred to R4 or the scope or duration of those obligations, and (iii) they do not mention

the alleged modification or the Agreement at all. Accordingly, the emails do not constitute a memorandum of the agreement Glorieta seeks to enforce.

Glorieta's invocation of the doctrine of part performance, Opp. at 14, is similarly unavailing. Under Florida law, "part performance will remove an oral contract from the statute of frauds and enable it to be specifically enforced in equity" where nonenforcement would facilitate a fraud. Ioselev v. Schilling, 2014 WL 905521, at *6 n.10 (M.D. Fla. Mar. 7, 2014) (citing Celano v. Dlabal, 591 So. 2d 653, 655 (Fla. Dist. Ct. App. 1991)). However, Glorieta has not plausibly alleged performance related to to the alleged modification. As explained above, the conduct identified in the SAC is consistent with the parties' obligations under the Partnership Agreement, and Glorieta does not identify any responsibility it relinquished, any new obligation it performed, or any benefit conferred upon R4 solely pursuant to the modification.

In sum, Glorieta has not plausibly alleged written consent to a modification, an enforceable oral modification notwithstanding Section 12.1, or a modification satisfying the Statute of Frauds. Count I is therefore dismissed to the extent it rests on the

Partnership Agreement "as modified," and Count II is dismissed in its entirety.

## II. Glorieta's Remaining Contract-Based Claims

Having concluded that Glorieta has not plausibly alleged a modification of the Partnership Agreement, the Court turns to the remaining contract-based claims. Count I alleges that R4 breached the Agreement as written by failing to pay amounts due under Section 3.3 and by removing the General Partners without Cause under Section 6.2. SAC ¶ 31. Count III asserts promissory estoppel based on R4's alleged promises to assume responsibility for certain repairs and the Forms 8609, and Count IV asserts that R4's abandonment of those responsibilities breached the implied covenant of good faith and fair dealing. Id. ¶¶ 33-44. None states a claim.

### a. Count I: Breach of the Partnership Agreement as Written

A claim for breach of contract under Florida law requires (i) a valid contract, (ii) a material breach, and (iii) damages. Beck v. Lazard Freres & Co., 175 F.3d 913, 914 (11th Cir. 1999) (citing Abruzzo v. Haller, 603 So.2d 1338, 1340 (Fla. Dist. Ct. App. 1992)). When performance is conditioned upon the occurrence of an event, the claimant must also allege the condition occurred or was excused. See Restatement (Second) of Contracts § 224 (1981).

Glorieta has not adequately alleged a breach of either Section 3.3 or Section 6.2.

**i. Fourth Installment**

First, Glorieta alleges that R4 breached Section 3.3 by failing to pay the full amount of its capital contribution. SAC ¶ 31. Specifically, Count IV alleges that the disputed payment is approximately $4,593,928 remaining under the Fourth Installment. Id. ¶ 39. However, Section 3.3 made each installment payment payable only upon the satisfaction of conditions specified for that installment. P'Ship Agreement § 3.3.1. Those conditions included "Rental Achievement," and the amount and timing of the installments were subject to specific adjustments and deferrals.[8] Id. §§ 3.3.1, 3.6, 3.7. The SAC does not allege that those conditions were satisfied, and Glorieta acknowledges that the Forms 8609 have not issued. SAC ¶ 28. The Fourth Installment Payment Date Certificate, executed by Glorieta on November 9, 2022, likewise states that Rental Achievement "ha[d] not occurred." ECF

[8] The Partnership Agreement defines "Rental Achievement" as the date on which certain conditions have occurred and others remain ongoing, including that: (i) R4 receives satisfactory evidence that the Property maintained at least a 95% occupancy rate for three consecutive calendar months and that the required percentage of Eligible Unites qualified for tax credits; (ii) the Partnership achieved the specific debt service coverage ratio for three consecutive months; (iii) R4 received a complete copy of the Partnership's application to the Florida Housing Finance Corporation for Forms 8609 for all buildings; and (iv) R4 received the final Accountants' Certificate and Accountants' Completion Certificate. P'Ship Agreement at 25-26.

No. 61-11. Glorieta does not seriously contend otherwise and instead argues that R4 prevented satisfaction of the conditions precedent and therefore cannot rely upon their nonoccurrence. Opp. at 16-17. That doctrine does not assist Glorieta here.

Florida law recognizes the general principle that a party who "prevents the happening of a condition precedent upon which his liability is made to depend, cannot avail himself of his own wrong and thereby be relieved of his responsibility to perform under the contract." Ward v. Branch, 429 So. 2d 71, 74 (Fla. Dist. Ct. App. 1983). But Glorieta's prevention theory rests on the alleged 2022 modification, asserting that R4 assumed responsibility for obtaining the Forms 8609 and abandoning that responsibility, preventing satisfaction of a condition to the Fourth Installment. SAC ¶¶ 39-42; Opp. at 16-17. As already discussed, the SAC does not plausibly allege that R4 assumed Glorieta's contractual responsibility for obtaining the Forms 8609. Under the Partnership Agreement, Glorieta remained responsible for preparing necessary certifications and taking the reporting actions required to qualify for tax credits, while R4 possessed a right of review. P'Ship Agreement §§ 11.3.6, 14.32. Indeed, the November 22 certificate states that Glorieta continued to use commercially reasonable efforts to obtain the Forms 8609. ECF No. 61-11 ¶ 3.

Because the SAC does not plausibly allege either that the relevant conditions occurred or that R4 wrongfully prevented their occurrence, it fails to state a claim based on an any unpaid balance of the Fourth Installment.[9]

**ii. Glorieta's Removal**

Glorieta further alleges that R4 breached the Agreement by "wrongfully removing the general partners[.]" SAC ¶ 31. Section 6.2 authorized R4 to remove a General Partner for "Cause," which included, inter alia, a General Partner's violation or default under a material covenant, agreement, representation, or warranty in the Partnership Agreement where the violation could reasonably be expected to have a material adverse effect upon the Partnership, the Property, or R4. P'Ship Agreement § 6.2(i). "Cause" also included an uncured material default under the HAP Contract. Id. § 6.2(i) and at 23, 26.

The SAC does not allege facts plausibly showing that R4 lacked Cause. It acknowledges that HUD became dissatisfied with the progress of repairs at the Property and indicated its intention to abate payments under the HAP Contract. SAC ¶ 25. The HUD notices attached to R4's Amended Complaint supply additional details,

---

[9] Glorieta also fails to allege that R4 prevented the occurrence of Rental Achievement, the certificate's independent condition, or identify any conduct by R4 that made the condition impossible to satisfy.

namely that: (i) on March 25, 2024, HUD advised the Partnership that exigent health and safety deficiencies identified during a March 11 inspection had not been timely corrected and that the Partnership was in default of its statutory, regulatory, and contractual obligations, and (ii) HUD abated the HAP Contract after determining that the deficiencies remained uncured. ECF Nos. 61-7, 61-8. Because the HAP Contract supplied approximately ninety percent of the Property's rental revenue, the abatement plainly had a material adverse effect upon both the Partnership and Property. These events thus fall within the Agreement's definition of Cause.

Glorieta nevertheless argues that R4's asserted basis for removal was "pretextual" and that R4 sought to obtain the equity that Glorieta otherwise would have received at the conclusion of the compliance period. Opp. at 17; SAC ¶¶ 27-28, 57. However, the SAC itself alleges only that R4 benefitted from exercising its removal right. Even if R4 benefitted from the removal of Glorieta, such benefit does not negate the existence of Cause where the specified conditions have occurred, and the conclusory assertion that the removal was "wrongful" does not permit the Court to

disregard the documents evidencing the HUD default and abatement on which the removal claim depends.[10]

Accordingly, Count I fails to state a claim based on either the Fourth Installment or the removal of the General Partners and is dismissed.

**b. Count III: Promissory Estoppel**

Count III alleges that, beginning in 2022, R4 represented it would fund, assist with, and manage certain repair work and the Partnership's efforts to obtain the Forms 8609. SAC ¶ 34. Specifically, Glorieta alleges that it relied on those representations by agreeing to divide the relevant responsibilities with R4. Id. ¶¶ 35-36. The Court agrees with R4 that this claim is foreclosed by the Statute of Frauds.

As discussed above, the same alleged 2022 promise underlying the modification theory in Counts I and II falls within Florida's Statute of Frauds and is unenforceable absent a signed writing containing its essential terms, which Glorieta has not pleaded. Glorieta cannot avoid that result by recasting the same

[10] Separately, Glorieta attempts to attribute HUD's action to R4's failure to perform the responsibilities it allegedly assumed in 2022. SAC ¶¶ 25-26, 42. Again, that argument depends on the alleged modification already rejected by this Court. The Partnership Agreement assigned exclusive management and control of the Partnership to Glorieta and charged it with supervising the Property's maintenance and management. P'Ship Agreement §§ 4.1, 4.6.1. Because Glorieta has not plausibly alleged the transfer of those responsibilities, it cannot avoid the contractual consequences of the HUD default.

unenforceable promise as a claim for promissory estoppel. The Florida Supreme Court has held that promissory estoppel may not be employed to circumvent the Statute of Frauds. DK Arena, Inc. v. EB Acquisitions I, LLC, 112 So.3d 85, 96-97 (Fla. 2013); Tanenbaum v. Biscayne Osteopathic Hosp. Inc., 190 So. 2d 777, 779 (Fla. 1966). As explained in DK Arena, permitting reliance upon an oral promise to overcome the statutory writing requirement would effectively nullify the Legislature's determination that agreements within the statutes are unenforceable unless reduced to writing. 112 So.3d at 96-97. Accordingly, Count III is dismissed.

**c. Count IV: Breach of Covenant of Good Faith and Fair Dealing**

Count IV alleges that R4 breached the implied covenant of good faith and fair dealing by assuming responsibility for the Forms 8609 and certain repair work in 2022 and then "reneg[ing] on its promise" in 2024. SAC ¶¶ 39-43. R4 contends that the claim fails because Glorieta identifies no express contractual obligation that R4 breached and instead invokes duties that the Partnership Agreement assigns to Glorieta. Mot. at 12-13. The Court agrees with R4.

Florida law implies a covenant of good faith and fair dealing in every contract, but the covenant is not an "independent term within a contract." Ernie Haire Ford, Inc. v. Ford Motor Co., 260

F.3d 1285, 1291 (11th Cir. 2001). The covenant must relate to the performance of a specific contractual provision and cannot be used to vary the agreement's terms or impose obligations inconsistent with those terms. See Burger King Corp. v. Weaver, 169 F.3d 1310, 1317-18 (11th Cir. 1999). Where a claim for breach of the covenant of good faith and fair dealing is "indistinguishable" from a breach of contract claim, the former is "impermissibly duplicative and properly dismissed." Alhassid v. Bank of Am., N.A., 2015 WL 11110557, at *8 (S.D. Fla. Nov. 4, 2015) (collecting cases). Count IV fails under either characterization of Glorieta's argument.

First, to the extent Count IV is based on R4's failure to perform obligations under the alleged 2022 modification, it merely duplicates Counts I and II because the alleged bad-faith conduct is precisely the asserted breach. Second, to the extent Count IV invokes the Partnership Agreement as written, it seeks to impose duties contrary to the Agreement's terms. The Agreement vested management authority in Glorieta and assigned it responsibilities for the Property's operation, maintenance, and compliance with tax-credit requirements. P'Ship Agreement §§ 4.1, 4.6.1, 14.32. While R4 possessed review and approval rights, the implied covenant does not transform those limited rights into a duty to assume Glorieta's obligations. Further, Glorieta identifies no

discretionary authority that R4 exercised dishonestly or arbitrarily and only challenges R4's failure to perform obligations it was never assigned. Accordingly, Count IV is dismissed.

**III. Count V: Fraudulent Misrepresentation**

Count V asserts fraudulent misrepresentation against R4, Mr. Sullivan, and Mr. Schnitzer. SAC ¶¶ 45-50. Glorieta advances the familiar argument that, beginning in 2022, counter-defendants represented that R4 would fund, assist with, and manage certain repair work and the Partnership's efforts to obtain Forms 8609. Id. ¶ 46. It further alleges that counter-defendants knew these representations were false and had no intention to perform when the representations were made, and that the representations were designed to induce Glorieta to continue investing in the Property and to divide responsibilities with R4. Id. ¶¶ 48-49. Counter-defendants contend that the claim should be dismissed because Glorieta fails to plead fraud with particularity, and, in any event, sets forth only conclusory allegations concerning falsity and reliance. Mot. at 15-18. The Court agrees that Glorieta's allegations fail to state a claim for fraudulent misrepresentation.

The parties apply New York law to this claim, as does the Court.[11] Under New York law, a claim for fraudulent misrepresentation requires a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance, and resulting injury. Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009). Fraud claims are also subject to the heightened pleading requirements of Rule 9(b), which requires a plaintiff to plead the circumstances constituting fraud with particularity, including the speaker responsible for each challenged statement, where and when the statements were made, and to allege facts giving rise to a strong inference of fraudulent intent. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006); Fed R. Civ. P. 9(b).

First, the SAC does not identify the alleged misrepresentations with particularity as to each counter-defendant. It alleges generally that "R4 GL Acquisition, Chris Sullivan, and Marc Schnitzer" made the relevant representations at some point in 2022. SAC ¶ 46. It does not identify which counter-defendant made any particular statement, when or where the statement was made, or the circumstances it was communicated to Glorieta. The deficiency is especially notable as to Mr.

[11] See Mot. at 15; Opp. at 18.

Schnitzer, given that the SAC identifies no statement, communication, or other conduct by him concerning the repairs, the Forms 8609, or the alleged modification. Indeed, apart from identifying his residence, id. ¶ 6 and alleging generally that he and Mr. Sullivan "control and manage" R4, id. ¶ 56, the SAC contains no substantive allegation against Mr. Schnitzer at all. Such group pleading does not satisfy Rule 9(b), which requires a complaint asserting fraud against multiple defendants to inform each defendant of his alleged participation in the fraud. DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987).[12]

Glorieta nevertheless argues that the statements may be attributed collectively because counter-defendants acted as a single entity, citing Pentacon BV v. Vanderhaegen, 725 F. Supp. 3d 350, 374-75 (S.D.N.Y. 2024). Opp. at 18-19. However, the SAC does not allege facts supporting that characterization. Unlike in Pentacon, where the individual defendant was the sole officer, employee, and agent of the entities whose statements he was found to have authored, the SAC alleges only that Messrs. Sullivan and

[12] See also Dove v. Fordham Univ., 56 F.Supp.2d 330, 335 (S.D.N.Y. 1999) ("[W]here the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.") (citation and internal quotation marks omitted).

Schnitzer "control and manage" R4. SAC ¶ 56. It does not allege that either is the sole agent of R4, that they jointly made any statement, or that either individual made representations attributed to R4. The bare allegation that two individuals manage a company does not compel the Court to attribute every alleged corporate representation to each of them personally.

Second, even as to Mr. Sullivan and R4, the SAC does not identify an actionable misrepresentation. As explained above, none of the four emails from Mr. Sullivan cited in the SAC state that R4 assumed repair or Form 8609 responsibilities. Even construed in the light most favorable to Glorieta, the emails merely (i) describe R4's existing right to be informed of and approve certain work, and (ii) describe Mr. Sullivan's observations and involvement. SAC ¶¶ 19-22. None state that R4 assumed the responsibilities Glorieta now attributes to it, and none mention the Forms 8609.

Third, the SAC does not adequately plead justifiable reliance. It alleges that Glorieta "reasonably relied" on the representations and "agreed to divide" responsibilities with R4. Id. ¶ 49. Glorieta does not, however, identify any specific action it took, any expenditure it made, or any obligation it refrained from performing in reliance on a particular representation by a

particular defendant. This catch-all reliance allegation fails to satisfy Rule 9(b). See Granite Partners, L.P. v. Bear, Stearns & Co., 58 F. Supp. 2d 228, 258-59 (S.D.N.Y. 1999) (dismissing fraud claim for failure to plead facts supporting a "catch-all allegation" of reliance); see also Olson v. Major League Baseball, 447 F. Supp. 3d 159, 167 (S.D.N.Y. 2020) ("[A] plaintiff must allege with particularity that it actually relied upon the [defendant's] supposed misstatement[.]") (internal quotation marks and citation omitted), aff'd, 29 F.4th 59 (2d Cir. 2022).[13]

Finally, Glorieta's fraudulent misrepresentation claim repackages its contract claims. Under New York law, a fraud claim may not be maintained where it arises from the same facts as a breach of contract claim and adds only that the defendant did not intend to perform the promised obligations. See, e.g., Best W. Int'l, Inc. v. CSI Int'l Corp., 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994) ("[S]imply dressing up a breach of contract claim by further alleging that the promisor had no intention" to perform "is insufficient to state an independent tort claim."). To maintain both claims, a claimant must allege a legal duty separate

[13] Glorieta's reliance allegation is also difficult to square with the Partnership Agreement itself, which vested the General Partners with exclusive management authority and assigned them responsibility for maintaining the Property. P'Ship Agreement §§ 4.1, 4.6.1. The SAC alleges no facts explaining why Glorieta reasonably understood the cited communications to relieve it of those obligations.

from the contract, a fraudulent representation collateral or extraneous to the contract, or special damages not recoverable as contract damages. Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996). Glorieta does not allege any of those circumstances and identifies no independent duty, no collateral misrepresentation, and no distinct fraud damages. Indeed, the alleged misrepresentation is identical to the promise underlying Glorieta's contract and promissory-estoppel claims: that R4 would fund, assist with, and manage repairs and the Form 8609 process. Compare SAC ¶ 46 with id. ¶¶ 16-17, 32, 34-35. The allegedly fraudulent conduct is R4's failure to perform those promises, and the alleged injury flows from that nonperformance. Accordingly, Count V is dismissed as to R4, Mr. Sullivan, and Mr. Schnitzer.

## IV. Counts VI and VII: Fiduciary Duty Claims

Count VI alleges that R4 owed fiduciary duties to Glorieta because it agreed to actively participate in the Partnership's management. SAC ¶ 52. Glorieta alleges that R4 breached those duties by failing to adequately fund, assist with, and manage repair work at the Property and the Partnership's efforts to obtain the Forms 8609. Id. ¶ 53. Count VII further alleges that Messrs. Sullivan and Schnitzer knew of, substantially assisted, and

benefitted from those breaches. Id. ¶¶ 55-58. Counter-defendants respond that the claims are barred both by the independent tort doctrine and Florida law. Mot. at 18-24. The Court agrees with counter-defendants.

**a. Breach of Fiduciary Duty**

To state a claim for breach of fiduciary duty under Florida law,[14] a plaintiff must allege the existence of a fiduciary duty, a breach of that duty, and damages proximately caused by that breach. Gracey v. Eaker, 837 So.2d 348, 353 (Fla. 2002). As an initial matter, Florida law provides that a limited partner like R4 does not owe fiduciary duties to the limited partnership or to another partner solely by reason of acting as a limited parter. Fla. Stat. § 620.1305(1). Here, the Partnership Agreement vested "exclusive management and control" of the Partnership in Glorieta and charged it with managing the Property. P'Ship Agreement §§ 4.1, 4.6.1. R4 possessed specific review, consent, approval, and

[14] Courts in this District have applied the internal affairs doctrine, under which the law of the state of formation governs claims concerning the relationship between an entity, its principals, and its partners or shareholders, to claims for breach of fiduciary duty and aiding and abetting breach of fiduciary, on the ground that such claims are inherently related to the underlying fiduciary relationship. See Buckley v. Deloitte & Touche USA LLP, 2007 WL 1491403, at *13 (S.D.N.Y. 2007). The parties appear to agree that Florida law governs Counts VI and VII, which concern the internal governance of a Florida limited partnership. P'Ship Agreement § 16.8. The application of Florida law here is also consistent with this Court's prior determination that Florida law governs aiding and abetting claims arising from the internal affairs of the Partnership. Glorieta LLC, 2026 WL 579181, at *9.

information rights intended to protect its interests as Investor Limited Partner, which the Agreement carefully distinguished from Glorieta's plenary management authority. Id. §§ 4.1, 4.2, 11.3.6, 11.3.12, 14.16.1.

Glorieta therefore premises Count VI on the allegation that R4 agreed to assume an active management role. SAC ¶ 52; Opp. at 20-22. However, that theory depends upon the same alleged modification rejected above. The SAC does not plausibly allege that the parties transferred management authority to R4 or that R4 assumed Glorieta's responsibilities. The specific conduct alleged does not support a different conclusion. Mr. Sullivan's requests to remain informed, participation in developing scopes of work, inspections of the Property, and communications with third parties demonstrate R4's involvement in matters concerning its investment. SAC ¶¶ 19-22. They do not suggest that R4 assumed control over the Partnership's day-to-day operations or agreed to act as a fiduciary for Glorieta. Further, the mere allegation that R4 retained counsel concerning the Forms 8609 does not establish a delegation of managerial authority. Glorieta's reliance on decisions recognizing that a limited partner may owe fiduciary duties when it exercises management authority does not rescue the claim. Opp. at 21-22. Assuming that principle applies here, the

SAC does not identify what management authority R4 acquired, when it acquired that authority, or how that authority displaced the General Partners' express contractual responsibilities, leaving only the conclusory assertion that R4 agreed to actively participate in the management of the partnership. Id. ¶ 52.

Further, Count VI cannot proceed as a genuine alternative to Counts I and II under Rule 8(d). A claim is properly pled in the alternative only where a plaintiff may fail on one theory and still prevail on another. In re SKAT Tax Refund Scheme Litig., 356 F. Supp. 3d 300, 325 (S.D.N.Y. 2019). Here, R4's alleged assumption of fiduciary obligations is premised on "agreeing to actively participate in the management of the partnership," which is the same 2022 modification underlying Counts I and II that has already been rejected by the Court. SAC ¶¶ 15-17, 32, 35, 52. The alleged breach fares no better. Glorieta alleges that R4 breached its fiduciary duties by failing to perform the same repair and Form 8609 responsibilities it allegedly promised to assume. Id. ¶¶ 53, 32, 35, 40-42. The SAC therefore identifies no separate fiduciary misconduct independent of the alleged contractual performance. Because Count IV cannot succeed unless the rejected modification is credited, it rises and falls with Counts I and II and does not stand as their alternative.

Glorieta also alleges that R4 acted for its own financial benefit and stands to receive a "massive windfall" following the General Partners' removal. Id. ¶¶ 42, 57. However, Florida law provides that a limited partner does not violate a duty merely because its conduct furthers its own interest. Fla. Stat. § 620.1305(3). As discussed above, the allocation of tax credits and losses were governed by the Partnership Agreement, and R4's alleged entitlement to additional equity arose from the removal provisions of that Agreement. The SAC does not allege facts showing that R4 misappropriated a Partnership opportunity, diverted an assert entrusted to it, or otherwise violated a duty independent of the parties' contractual agreement. Accordingly, Count VI must be dismissed.

**b. Aiding and Abetting Breach of Fiduciary Duty**

To state a claim for aiding and abetting breach of fiduciary duty under Florida law, a plaintiff must allege (i) a fiduciary duty on the part of the primary wrongdoer; (ii) a breach of that duty; (iii) knowledge of the breach by the aider and abettor; and (iv) substantial assistance or encouragement of the wrongdoing by the aider and abettor. Aquent LLC v. Stapleton, 65 F. Supp. 3d 1339, 1350 (M.D. Fla. 2014). A plaintiff must allege facts that establish, "or allow the fair inference," that the defendant had

"actual knowledge" of the underlying misconduct. Isaiah v. JPMorgan Chase Bank, N.A., 2017 WL 5514370, at *3 (S.D. Fla. Nov. 15, 2017), aff'd sub nom. Isaiah v. JPMorgan Chase Bank, 960 F.3d 1296 (11th Cir. 2020) (citation omitted). Further, in the absence of a fiduciary duty claim, a claim for aiding and abetting a breach of fiduciary duty fails. FW Distrib., LLC v. J.P. Morgan Chase Bank, N.A., 2024 WL 4665255, at *14 (S.D. Fla. Nov. 4, 2024). Accordingly, because Count VI fails for the reasons already discussed, Count VII necessarily fails with it.

Independent of that threshold defect, however, Count VII does not adequately allege knowledge or substantial assistance. The SAC alleges only that Messrs. Sullivan and Schnitzer "control and manage" R4, knew of the alleged breaches, authorized decisions contrary to Glorieta's interest, and substantially assisted and encouraged R4. SAC ¶¶ 56-57. Those assertions largely repeat the elements of the cause of action and do not identify the conduct through which either individual knowingly assisted a fiduciary breach. This defect is particularly clear as to Mr. Schnitzer, to whom the SAC attributes no decision, communication, or act. The allegations concerning Mr. Sullivan describe the category of conduct addressed above, namely communications about repairs, inspecting the Property, assisting in developing a scope of work,

and corresponding with HUD and vendors. SAC ¶¶ 19-22. These acts more accurately reflect Mr. Sullivan's ordinary involvement in matters concerning R4's investment rather than a knowing effort to help R4 abandon an assumed responsibility or remove Glorieta. Accordingly, Count VII is dismissed as to Messrs. Sullivan and Schnitzer.

## V. Counts IX and X: Equitable Claims

Counts IX and X assert claims for an equitable accounting and unjust enrichment, respectively. SAC ¶¶ 62-73. The parties apply New York law to these claims, and the Court does the same.[15] Glorieta argues that both claims may be pleaded in the alternative under Rule 8(d). Opp. at 24-25. Counter-defendants contend that the claims cover the exact same subject matter as the breach of contract claims and should therefore be dismissed as duplicative. Mot. at 24-25. Because a claim is genuinely alternative only where a plaintiff could fail on one theory and still prevail on the other, the Court agrees with counter-defendants.

### a. Equitable Accounting

Count IX rests on the allegation that Glorieta "entrusted" R4 with oversight of repairs and management of Partnership funds and that R4 "willfully and materially breached the Partnership

---

15 See Mot. at 24-25; Opp. at 24-25.

Agreement" in a manner that also violated fiduciary duties and the covenant of good faith and fair dealing. SAC ¶¶ 65-67. Those allegations are premised on the alleged 2022 modification, which the Court has already found inadequately pleaded, and the fiduciary relationship it supposedly created, which the Court has likewise rejected. Count IX therefore does not present a genuine alternative to Glorieta's contract and fiduciary duty claims because it depends on the same deficient premises.

Further, and in any event, Count IX fails on its own terms. To state a claim for an equitable accounting under New York law, a plaintiff must allege (i) relations of a mutual and confidential nature, (ii) money or property entrusted to the defendant imposing on him a burden of accounting, (iii) that there is no adequate legal remedy, and (iv) in some cases, a demand for an accounting and a refusal. Rodriguez v. GB Lodging, LLC, 2023 WL 5976223, at *9 n.14 (S.D.N.Y. Sep. 14, 2023) (citation omitted). First, Glorieta has not adequately alleged a confidential or fiduciary relationship with R4. As discussed above, R4 did not owe Glorieta fiduciary duties merely because it was a limited partner, and the SAC does not plausibly allege that R4 assumed management authority sufficient to create the fiduciary relationship asserted. Nor does the SAC identify money or property belonging to Glorieta that

R4 received and for which R4 assumed an obligation to account. It instead refers to Partnership funds, construction expenditures, tax credits, losses, and profits, which are governed by the Partnership Agreement. SAC ¶¶ 65, 68. Glorieta also fails to allege the absence of an adequately remedy at law. An equitable accounting is unavailable where a breach of contract claim addressing the same conduct provides a remedy in damages. Twelve Sixty LLC v. Extreme Music Libr. Ltd., 2018 WL 369185, at *5 (S.D.N.Y. Jan. 9, 2018). Count IX relies on R4's alleged breach of the Agreement and seeks an accounting concerning the same funds and benefits implicated by Glorieta's contract claims. SAC ¶¶ 66-68. Accordingly, Count IX is dismissed as asserted against R4.

**b. Unjust Enrichment**

Count X fares no better. As a quasi-contractual remedy, unjust enrichment is generally not available under New York law where a valid and enforceable agreement governs the same subject matter. See Clark-Fitzpatrick, Inc. v. Long Is. R.R., 70 N.Y.2d 382, 388 (1987); Tech+IP Advisory, LLC v. Blackberry Ltd., 2024 WL 4167501, at *10 (S.D.N.Y. Sep. 12, 2024). However, a plaintiff can plead unjust enrichment in the alternative if there is a "bona fide dispute as to the existence of a contract or whether the scope of an existing contract covers the disagreement between the

parties[.]" Pauwels v. Deloitte LLP, 83 F.4th 171, 188 (2d Cir. 2023) (citation omitted). Here, there is no dispute that the Partnership Agreement is valid or that it governs the allocation of the tax credits, losses, and interests identified in Count X. The Partnership Agreement indisputably binds the parties and governs the precise benefits that Glorieta alleges R4 unjustly retained.[16] The parties dispute only whether the Agreement was later modified and whether R4 complied with its obligations. But the alleged modification concerns responsibility for repairs and obtaining Forms 8609, and Glorieta does not allege that it altered the Agreement's allocation of benefits identified in Count X.

Further, Glorieta does not identify any benefit that was conferred upon R4 outside the Agreement, and its allegation that it developed and maintained the Property merely describes performance of the General Partners' contractual responsibilities. SAC ¶ 70. Likewise, its assertion that R4 failed to properly fund

---

[16] Compare Tech+IP, 2024 WL 4167501, at *11 (dismissing quasi-contractual claims where there was no question that the contract governed the dispute); Stifel, Nicolaus & Co. v. Shift Techs., Inc., 2022 WL 3648145, at *6 (S.D.N.Y. Aug. 23, 2022) (same), with Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc., 2026 WL 2035965, at *12 (2d Cir. July 15, 2026) (permitting quasi-contractual claims where the parties "vigorously dispute[d]" whether the relevant contract applied and defendants maintained that they were not parties to the agreement), and Lynx Whole Loan Acquisition LLC v. Caliber Home Loans, Inc., 2026 WL 2269078, at *4 (S.D.N.Y. Aug. 6, 2026) (declining to dismiss an unjust enrichment claim as duplicative where the parties disputed whether the relevant contract governed the subject matter at issue).

and manage repairs rests on the same alleged modification underlying its contract claims. Id. ¶ 71. Accordingly, Count X does not present an alternative theory outside the parties' contractual relationship and is duplicative of Glorieta's contract claims. Count X is therefore dismissed.

## VI. The SAC Is Dismissed with Prejudice

Glorieta requests leave to amend should the Court identify pleading deficiencies. Opp. at 25 n.5. The Court denies that request. A court may deny leave to amend for good reason, including futility or a party's failure to explain how amendment would cure the defects identified in its pleading. See Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC, 736 F. App'x 274, 279 (2d Cir. 2018) (affirming denial of leave to amend where the party failed to explain how amendment would cure the identified deficiencies). Glorieta has already amended twice, once by leave granted to address anticipated deficiencies, ECF No. 87, and once "for the specific purpose of adding [a single] email . . . and for no wider purpose," ECF No. 94.

Most of the counterclaims addressed above fail for reasons that no further pleading could cure. Specifically, the Statute of Frauds bars the alleged 2022 modification as a matter of law, and Counts III, VI, VII, IX, and X, along with Count IV's alternative

theory, depend entirely on that modification or on obligations the Partnership Agreement does not assign to R4. Because those defects are legal rather than factual, no additional allegations could save the claims. Mr. Schnitzer's dismissal from Count V rests on similar grounds. The SAC does not attribute any statement or act to him. Count V faces a similar hurdle, given that it could only be cured by alleging a misrepresentation collateral to the same 2022 promise that the Court already rejected. Further, Glorieta's opposition does not identify what, if anything, another amendment would add.

With respect to the remaining defects, namely Count I's failure to allege a breach of Section 3.3 or Section 6.2 of the Partnership Agreement and Count V's failure to plead an actionable misrepresentation or nonconclusory reliance as to R4 and Mr. Sullivan, Glorieta also does not identify any facts it would allege if given another opportunity. Where, as here, a party requests leave only in passing, it must explain how amendment could cure the deficiencies identified by the Court. See, e.g., Mansour v. Stanley, 2026 WL 636874, at *13 (S.D.N.Y. Mar. 6, 2026). Glorieta has not done so here.

Accordingly, Counts I through VII, Count IX insofar as asserted against R4, and Count X are dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, counter-defendants' motion to dismiss the Second Amended Counterclaim is granted. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 114.

Dated: August 12, 2026
New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE